2024 IL App (2d) 220406-U
No. 2-22-0406
Order filed July 12, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| LAURA ARTEAGA, | ) | Appeal from the Circuit Court |
| | ) | of Kendall County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19-L-51 |
| | ) | |
| PATRICK WATSON, | ) | Honorable |
| | ) | Stephen L. Krentz, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Presiding Justice McLaren and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Jury's award of no damages for pain and suffering ignored a proven element of damages and was therefore against the manifest weight of the evidence in light of jury's award of partial damages for post-accident medical expenses. Reversed and remanded.

¶ 2    Plaintiff, Laura Arteaga, filed a complaint against defendant, Patrick Watson, alleging that he was negligent when his vehicle struck the rear of plaintiff's stopped vehicle on September 28, 2016. Plaintiff sought damages for medical expenses, pain and suffering, and loss of normal life. Following a jury trial, plaintiff was awarded damages for medical expenses, but not pain and suffering. On appeal she argues that the failure to award her damages for pain and suffering was

error and requests a new trial on the issue of damages. For the following reasons we reverse and remand for a new trial on damages.

¶ 3                                    I. BACKGROUND

¶ 4      The following facts were developed at the jury trial.[1]

¶ 5      Plaintiff presented the videotaped evidence deposition of plaintiff's treating physician, Dr. Mir Ali, a board-certified orthopedic surgeon specializing in spine surgery. Dr. Ali performed between 250 to 350 surgeries per year, mostly to the lower back and neck.

¶ 6      Dr. Ali first saw plaintiff May 2016, four months before the accident in question, for pain going down her left leg, which had been "quite severe over the last two months." Plaintiff did not indicate any trauma or injury but associated the pain with a kidney infection. She had not experienced back pain prior to early 2016. Dr. Ali testified that he relies on the history that is provided by his patients in making treatment decisions and forming opinions. He agreed that it is in patients' best interests to provide true and correct information to their physician concerning their condition. Based on her complaints, her history, and her examination, Dr. Ali strongly believed plaintiff had a herniated disk with a pinched nerve and radiating pain, which he termed radiculitis.

---

[1]The record does not reflect the order in which witnesses were called or evidence depositions presented, nor do the trial transcripts contain any matters outside of witness testimony, such as arguments or rulings on motions or jury instructions, each transcript simply ending with "Whereupon proceedings were had which were not made part of this record." Additionally, while it appears that two additional witnesses were presented by plaintiff, Alex Blumenshine and Erica Hardman, they are not contained in the record or discussed by the parties in this appeal.

Plaintiff's description of the pain in her back but also going mainly down the leg was "classically" associated with a pinched L5 nerve, which requires an MRI to confirm.

¶ 7    An MRI on May 19, 2016, showed a "large L4-L5 left-sided disc herniation." Dr. Ali discussed medications, non-surgical interventions and possible surgery as options. The following week, Dr. Ali gave plaintiff an epidural steroid injection. This anti-inflammatory medication was best administered in this way in part because plaintiff was diabetic. Dr. Ali testified that diabetes can affect nerves, cause complications with treatment, and result in slower healing from surgical and non-surgical interventions. On June 6, 2016, plaintiff called Dr. Ali to advise him that the injection had not relieved her pain. Dr. Ali testified that such injections have been known to be less effective in diabetic patients.

¶ 8    On June 9, 2016, Dr. Ali saw plaintiff for a pre-op visit for an L4-L5 microdiskectomy that was performed on June 13, 2016. In a follow-up visit on July 29, Dr. Ali stated that, "[o]verall, she was doing very well," although she also reported "some mild pain in her left lower extremity" when walking for more than 15 minutes or sitting for more than an hour. He was not concerned that the nerve had not yet healed, as that normally takes about 6 to 12 weeks, even longer in diabetics. He was "quite happy" with her healing at this stage, six weeks post-surgery and started her on physical therapy.

¶ 9    At her September 8, 2016, visit, plaintiff reported to Dr. Ali that "she was doing well, but she did feel that she aggravated her back on the left side with physical therapy the Friday before." She had been pain-free until that day. Dr. Ali testified that it is not uncommon for a patient to aggravate or irritate their back during a physical therapy session, but "it was a little concerning" because re-herniation can happen in up to 10 percent of people, so he decided to order another MRI, which occurred on September 22, 2016. This MRI did not show a recurrent herniation at L4-

L5, but there was "a small disc bulge at L5-S1," which he described as "nothing major" and did not believe it required "acute intervention at this time."

¶ 10    Plaintiff followed up with Dr. Ali on September 29, 2016, the day after the car accident. According to staff intake notes, plaintiff reported that her back pain had worsened with therapy but now she had "worsening back pain after MVA, and left leg pain worsening." Dr. Ali relied on this history, which he described as significant because the worsening of the leg pain indicated a "higher level of acuity than just the left-sided back pain." He was aware of the nature of the car accident plaintiff was in and testified that that type of accident could irritate or cause pinching of a nerve. He recommended that plaintiff refrain from physical therapy to see if her symptoms might subside and then she should return in a month.

¶ 11    At her next appointment, on October 20, 2016, plaintiff reported "having headaches and increased low back pain" since the accident. Dr. Ali believed she had a lumbar strain from the motor vehicle collision. He testified that this could be a myofascial problem involving soft tissue such as muscles, tendons, and ligaments that can be pulled or irritated, and which usually "settles down" over 6 to 8 weeks. Instead, plaintiff was having difficulty sleeping and was taking Norco, a narcotic pain reliever, "every night." He testified, "[o]bviously, her post-op course has been complicated by the accident." In order to "see if there had been any structural modification," Dr. Ali ordered another MRI, which was done on October 25. He also gave her a temporary handicapped parking sticker, as she was having trouble walking more than 200 feet. He testified that her reports of taking Norco and having difficulty walking were consistent with her pain being worse after the accident. Dr. Ali again agreed that he relied on these reports, as it is in the patient's best interests to provide him with true and accurate information.

¶ 12    Upon reviewing the October 25, 2016, MRI, Dr. Ali testified, "I didn't think there was much difference between the MRI before and after the accident," explaining that "MRI obviously misses things," including "very sensitive things that would cause a nerve to be pinched." He stated that nothing in the MRI was inconsistent with her complaints. He believed she had "some mild wear and tear" and degenerative disk disease, which caused her continuing pain. But there was not "something structural that may need surgical intervention." Dr. Ali prescribed Neurontin to help with her irritated nerves, as too many steroids, either injected or oral, can cause problems in diabetic patients.

¶ 13    Dr. Ali opined that, with plaintiff having worsened back pain and leg pain at three months post-accident, he did not believe she merely had lumbar strain anymore but that she had persistent back pain and radicular pain. In his opinion, her worsened pain was due in part to the automobile collision. He described her pre-accident physical therapy pain as a "little bit of a flare-up," but that after the accident "she got precipitously worse." He stated that, even though "it seems to me like she should be fine, at the end of the day she is complaining of pain. We treat patients. We don't treat MRI's * * * her testimony, her complaints, her subjective complaints are very important to me as her physician." Dr. Ali noted that an MRI is taken lying down and one would expect pain to be worse when standing up, thus "we don't want to necessarily give [the MRI] undue priority or importance."

¶ 14    As for plaintiff's worsening condition and pain, Dr. Ali opined that "the car accident was a major factor and the therapy may be a minor compounding factor as well." In his opinion, plaintiff's back was not as strong as the average person's and she was "more susceptible than the average person" to suffer aggravation of her prior L5 issues from a rear-end collision. Because she

did not have "any obvious structural findings or catastrophic findings on the MRI," he did not recommend surgery at this time, but ordered an EMG to assess neuropathy.

¶ 15    The EMG taken February 24, 2017, showed "no obvious evidence of any radiculopathy or nerve weakness, no nerve irritation * * * and there was no obvious evidence of any diabetic neuropathy." He described EMG as a nerve conduction test to assess abnormalities in the lower extremities, noting that it "is not a test for pain." He was not surprised that the EMG was negative because "her nerve compression was not severe enough to cause weakness." The EMG simply confirmed to Dr. Ali that plaintiff's pain going down into the left leg was not a diabetes-related problem.

¶ 16    Dr. Ali testified that plaintiff was also having right-sided radicular pain, which he said indicated that "this disc started to degenerate at an accelerated rate," causing the disk to "settle" and pinch the nerves as they exit the spine on both sides. He believed this accelerated after "the events of * * * September 2016." He described disk degeneration as common, but plaintiff's rate of degeneration was not: "I've never seen something that fast in someone." The variable that he temporally associated with plaintiff's disk degeneration was the accident.

¶ 17    Dr. Ali ordered another MRI, which was taken on March 23, 2017, and followed up with plaintiff on April 7, 2017. She "did have some more degenerative changes in the L4-L5 disc," which he said involved "a little bit more of that disc bulging" and more narrowing, which may explain her right-sided symptoms. He opined that this was also related to the automobile collision because "I have no other logical reason why she would go south so quickly and have these degenerative changes develop within months of her previous surgery when it usually takes years, if not decades." In his 12 years of practice performing thousands of diskectomies, he had never seen this before.

¶ 18    The following month, Dr. Ali gave plaintiff injections, but soon concluded that she would need fusion surgery, which was performed on July 10, 2017. Dr. Ali stated his opinion that the fusion surgery was caused by the accident because of the timing of her symptoms worsening and "the unprecedented acceleration of her disc degeneration over the first year."

¶ 19    Plaintiff continued pain medication and home exercises but in October 2017, sixteen weeks post-fusion, she had some axial back pain. However, "the pain going down her legs was gone." She continued to improve slowly but had some increased right-side pain, so Dr. Ali ordered another MRI, which was completed on April 19, 2018. This MRI showed worsening disk herniation on the right side at L5-S1, which was not present on previous MRIs. Dr. Ali attributed this to stress adjacent to the fusion and opined that, because the fusion was caused by the accident, so was the ensuing herniation at L5-S1.

¶ 20    Dr. Ali did not recommend another operation at that time, instead providing periodic injections and pain relievers, which continued to the time of trial. Dr. Ali opined that plaintiff would need future surgery and would have ongoing permanent pain. He further opined that the accident was "a major factor in her decline and her need for subsequent surgery and fusion in July of 2017 and the resultant effects of that on her adjacent segments and her back pain are the result of that lumbar fusion surgery." He testified that the basis for his opinion was the "the temporal worsening of her complaints, the worsening of her L4-L5 degeneration on MRI within a year."

¶ 21    On cross-examination, Dr. Ali admitted that in his discovery deposition taken almost two years earlier, he had said he had no opinion as to whether the accident was the cause of the 2017 surgery. He had testified in the discovery deposition that "we have a clear record of an aggravating episode in physical therapy, then the superimposed – within a couple of weeks after that, we have a seemingly minor accident but we clearly have the patient getting worse." However, Dr. Ali now

was of the opinion that the need for plaintiff's July 2017 surgery was worsening back pain, left leg pain and right leg pain, which he attributed to the accident and other factors, including diabetes, wear and tear, and the degeneration in her spine. He stated that the temporal relationship between the accident and "the accelerated degenerative changes of the L4-L5 over the course of several months leads me to that conclusion," adding that the accident altered the trajectory of her healing from the June 2016 surgery. He testified that plaintiff "clearly got worse from that accident" and noted "eventual changes on the MRI within a year" and that those changes and pain "precipitously have happened and radiographically steadily since the accident at the end of September [2016]."

¶ 22    On re-direct, Dr. Ali clarified that at his discovery deposition he had testified that the accident was "a cause" of plaintiff's worsening pain and the 2017 surgery.

¶ 23    Plaintiff Laura Arteaga testified that she was 43 years old, divorced, with three children. In 2016, she began working in Montgomery, a 25-mile commute from her home. She had experienced back pain with left leg pain beginning in early 2016 and began treating with Dr. Ali in May 2016. She had surgery for a herniated disk the following month and testified, "I didn't have any pain after the surgery." She testified she had no problems with her leg or back while sitting in her car during her daily commute.

¶ 24    Plaintiff participated in post-surgery physical therapy but began to feel "just like a discomfort" in her back after a session in September 2016. She saw Dr. Ali, who discontinued physical therapy and ordered an MRI, but she continued to commute and did not miss any work.

¶ 25    On the morning of September 28, 2016, she was driving to work when she came to a complete stop behind other cars that had stopped for a school bus. She then "got rear-ended" by defendant Patrick Watson. She testified that she had no warning prior to being struck and described the impact as "medium." She was wearing a seatbelt and described being moved "back and forth"

in her seat. She testified that her rear bumper did not have any damage prior to the collision, but identified damage in photographs taken after the accident, which was described as "an indentation" and "a gap" in the bumper, which also showed some red paint. She testified that this damage occurred as a result of the collision with defendant.

¶ 26    Immediately after her car was hit, plaintiff testified, "I was in a lot of pain" in her lower back. She did not get out of the car because of the pain, but defendant approached her window and asked her if she was okay. She replied no and police were called to the scene. She testified that she told the officer "I wasn't feeling good" and that her back was bothering her. Paramedics came to the scene and transported plaintiff to the hospital by ambulance. She told the paramedics she was feeling a lot of pain in her back "and then I started having pain in my left leg." She also described head and neck pain to the paramedics.

¶ 27    At the hospital, plaintiff testified, she spoke to a nurse and a doctor, telling them she was "in a lot of pain, and I just recently had back surgery a few months ago." At the hospital, plaintiff underwent "a bunch of tests, CT scans, MRI." After spending "all day" at the hospital, she was discharged with instructions to follow up with her surgeon, Dr. Ali, the next day. Plaintiff went home to rest and missed that day at work, along with the next two workdays.

¶ 28    The day after the accident, plaintiff saw Dr. Ali and told him about the car accident and that she was in a lot of pain in her lower back and left leg. Dr. Ali ordered an MRI and told plaintiff to rest, which she did.

¶ 29    Plaintiff returned to Dr. Ali on October 20, approximately three weeks post-collision. She told him her back pain was getting worse, as was the pain in her legs. She testified that Dr. Ali recommended "another injection," which she would eventually get on January 5, 2017. In the meantime, she was taking prescription Norco every night because she could not sleep from the

pain. She also asked Dr. Ali for a handicapped parking placard because she was in pain and had difficulty walking from the parking lot to her office once she returned to work. Her left leg was weak and was also having muscle spasms and shooting pain.

¶ 30    Plaintiff saw Dr. Ali in November and December, then had an "injection" in her back on January 5, 2017. She testified that it helped "a little bit," although she continued to have pain. She then had an EMG, which she described as "[n]eedles in your legs, and it was just very painful * * * [i]t felt like they were shocking me."

¶ 31    In March 2017, she again saw Dr. Ali because she was still in a lot of pain and now started having some right leg pain as well. Dr. Ali recommended she get another MRI and another steroid injection. She experienced relief for "a few days," but injections caused her blood glucose spikes, complicating her diabetes. Dr. Ali then recommended another disk fusion surgery, which she underwent in July 2017. She was hospitalized for three days, but after discharge continued to experience pain. She wore a brace for more than two months and took pain medication because she felt "[m]iserable." This surgery was followed by 12 weeks of lost time at work and 11 subsequent injections.

¶ 32    Plaintiff was asked to describe her life between the date of the collision and the date of the fusion surgery in July 2017, although her answer seemed to address her condition up to the time of the trial. She stated that her "leg was not the same," she had difficulty getting up in the morning because of pain, inability to manage her diabetes, needed the assistance of her children in daily activities, and got a divorce "because my husband couldn't take this anymore." She testified that she used to work out and had gained approximately 20 pounds. She stated that all the injections would help a little but then wear off. Since the surgery, her pain continued in her lower back and

both legs and she continued to get periodic injections. Dr. Ali recommended a second fusion surgery, which she had not scheduled at the time of the trial.

¶ 33    Plaintiff also testified as to her lost wages, stating that she lost approximately $134 per day, which included a three-day period immediately after the accident, 11 days on which she received injections, and twelve weeks after her fusion surgery in 2017.

¶ 34    On cross-examination, plaintiff described taking a weeks-long European vacation and cruise in 2018. She experienced no discomfort during the early part of the trip because she had gotten an injection prior to travelling but began to experience pain in her legs and back about a week into the vacation. She also testified that she had received disability pay, which covered some of her wage loss.

¶ 35    Plaintiff's counsel called defendant Patrick Watson as an adverse witness. Defendant testified that he brought his car to a complete stop behind plaintiff's while they waited for the school bus. He stated that after waiting for about 10 to 15 seconds, his foot slipped off the brake and "as I looked up, I hit the brake and I had already – I had already made contact." He was unsure of the exact distance his car traveled before it struck plaintiff's car, which could have been five to six feet or "could have been less." He believed he was traveling "around five miles per hour" at the point of impact.

¶ 36    Watson did not know if plaintiff's car had moved forward as a result of the impact, as he was focused on "making sure, being in an accident, being the person that was at fault, that I got out of the car to see if she was okay." Watson exited his vehicle and tapped on plaintiff's window to ask if she was okay, to which she responded, "I'm just scared. I didn't expect that." He agreed that she looked scared and upset. He did not remember her exiting her car, but observed emergency personnel remove her and place her on a stretcher.

¶ 37 On cross-examination, defendant testified that his conversation with plaintiff was "very brief" and that he believed he was the one who called the police. He further testified that there was no damage to his vehicle from the accident.

¶ 38 Plaintiff called Greg Shadle, who was at the time of trial a detective with Kendall County Sheriff's Office. On the date of the accident, Detective Shadle was assigned to patrol and was called to the scene. He had no independent recollection of many of the events in question but had prepared an accident report and testified as to his memory of some of his observations at the scene. In his report, Detective Shadle checked the box indicating a reported injury to plaintff. His practice was, upon arrival, to first ask a driver if they were injured and plaintiff had said yes. He did not indicate that her injuries were visible but she told him at the scene that she was having back pain. Detective Shadle listed "none" next to vehicle damage in his report but was also shown photographs of plaintiff's car and asked if he saw "damage to the bumper area," to which he answered, "I do."

¶ 39 On cross-examination, Detective Shadle specifically recalled that plaintiff "was upset and requested the ambulance for, I believe, back pain." When shown photos, he testified that he did not see any damage to defendant's car but did see damage to plaintiff's car on the "bumper beneath the license plate." He acknowledged that he had not listed any vehicle damage to either car in his report. He classified the accident as "minor" because he did not observe vehicle damage and there was no life-threatening injury. He has investigated over 500 auto accidents in his career.

¶ 40 Plaintiff also presented the videotaped evidence deposition of their retained expert Dr. Sergey Neckrysh, a board-certified neurosurgeon and head of the spine section of the department of neurosurgery at University of Illinois Chicago. Dr. Neckrysh reviewed plaintiff's medical

records, including all MRIs, reports, and notes, as well as depositions and the police report. He prepared a report and a supplemental report.

¶ 41    Dr. Neckrysh testified that, in his clinical practice, he takes a history from his patients and relies upon the information they provide. He described this as normal and he also reviews and relies on patient reports as part of a review, such as the one he performed in the instant case. He testified that, with nerve root injuries, the patient might present with pain in the distribution of the nerve, which he traces back to the nerve, a process he called "topical diagnostics." Dr. Neckrysh explained the difference between lumbar strain and nerve injury, in which a "sprain-strain is where there is a – basically a stretch beyond normal physiological limits between a muscle or a tendon," versus a nerve root injury, in which patients will have pain or sensory or motor deficit in the distribution of the nerve root. Lumbar strain does not have a pattern of "traveling" and usually resolves itself within three months. If a patient's pain does not resolve and they complain of pain that is radiating, he would suspect radicular nerve injury. This is diagnosed from patient reports, neurological examination, and MRI imaging.

¶ 42    Dr. Neckrysh testified that he would never form an opinion without "looking at the films" himself and noted that defendant's expert Dr. Phillips had not reviewed either the MRI films or reports prior to forming his initial opinions and report. Dr. Neckrysh compared the MRI taken pre-accident on September 22, 2016, with the post-accident MRI taken on November 10, 2016, as well as the MRI of March 23, 2017. He testified that the imaging showed progression of the nerve root compression caused by additional disk pathology, which he opined was caused by the accident. In his opinion, plaintiff's complaints of pain after the car collision were consistent with, and explained by, the MRI images.

¶ 43    Dr. Neckrysh explained that, prior to the accident, plaintiff had some pre-existing stenosis at L4-L5, which remained after the surgery and which can be made worse with any aggressive maneuver in physical therapy and temporarily pinch the nerve root. He stated that the forces in a vehicle accident can certainly compromise the nerve root further. Although both physical therapy and the accident could both contribute to plaintiff's increased pain, the force of a vehicle "slamming" into plaintiff's vehicle would be more significant than the physical therapy. Dr. Neckrysh stated that patients' reports of pain are important in attributing the pain to one cause of the other.

¶ 44    Dr. Neckrysh admitted that he was not an accident reconstructionist but that based on "everyday knowledge," cars are designed to absorb force and the damage on the exterior of a vehicle does not necessarily reflect the damage on the inside. He opined that, based on the minor damage to the vehicles, as shown in the photos, "any impact" would be sufficient to cause and aggravate the symptoms of someone recovering from recent back surgery. He further opined that, based on his review of the MRIs, plaintiff was susceptible to developing worsening back pain because of the car collision.

¶ 45    Based on his review of the March 2017 MRI and plaintiff's reported symptoms, Dr. Neckrysh further opined that the disproportionate degeneration of the disk at L4-L5 was due, in part, to the accident. He observed "structural changes" to plaintiff's spine on imaging after the collision: "[s]he initially develops more disk protrusion, a disk sticking out, and then she develops instability which then leads to another surgery by Dr. Ali." Plaintiff's first surgery made her nerve roots at L4-L5 level "much more susceptible to injury" and she sustained further injury from the accident. Dr. Neckrysh also noted the rapidity of plaintiff's degenerative changes at L4-L5 post-accident, "out of proportion to the other levels," which he believed was "due, in part, to the

automobile collision." He based his opinions on "morphology on imaging and patient symptoms," which he said are "[a]bsolutely" an important factor for any physician to consider.

¶ 46    Dr. Neckrysh disagreed with defense expert Dr. Frank Phillips's opinion that the only injury plaintiff suffered from the accident was a lumbar strain and Dr. Phillips's opinion that there were no structural changes to plaintiff's spine following the collision. According to Dr. Neckrysh, the MRIs after the accident showed structural injury to the disk itself, noting that Dr. Phillips had formed his opinion prior to reviewing the MRI films or reports. He had no doubt that the July 2017 fusion surgery was related to the car accident, stating, "[a]ll the symptoms and worsening on the imaging started after the accident." He further opined that plaintiff was likely to have future pain because of the accident.

¶ 47    On cross-examination, Dr. Neckrysh admitted that the September 22, 2016, MRI showed a post-surgery, residual disk bulge at L4-L5, but stated that "what Dr. Ali performed was sufficient to remove the herniated portion of the disk and that would relieve the patient's leg symptoms." The residual disk bulge was due to "inadequate surgical decompression," explaining that "one could have done a much bigger operation from the beginning on this patient," but that the disk itself cannot be repaired and Dr. Ali "performed surgery very adequately [in September 2016 and] removed all this herniated disk material" and decompressed the nerve root.

¶ 48    On re-direct examination, Dr. Neckrysh testified that plaintiff had been asymptomatic post-surgery and pre-accident, and that the June 2016 surgery had been successful in relieving plaintiff's pain. However, the car accident caused her to become more symptomatic to the point where she could not deal with the pain and she eventually underwent fusion surgery, which Dr. Neckrysh opined was caused by the accident.

¶ 49    A stipulation was entered into evidence listing plaintiff's medical bills totaling $327,000.55, stating that, if called, witnesses would testify that these were "the usual and customary charges for the services rendered." The stipulation noted that defendant disputes that the "need and cause of the treatment is related to the September 28, 2016, accident" and that the bills were reasonable. The itemized bills were as follows:

| | | |
|---|---|---|
| 1) | Rush Copley Hospital on 9/28/2016 | $13,288.00 |
| 2) | Oswego Fire Protection District on 9/28/2016 | $986.00 |
| 3) | Empact Emergency Phys LLC on 9/28/2016 | $611.00 |
| 4) | Grundy Radiologists Inc. on 10/25/2016 | $401.04 |
| 5) | Morris Hospital from 10/25/2017 to 7/13/2017 | $126,950.87 |
| 6) | Dr. Mir Ali (Rezin Orthopedics) from 9/26/2016 to 4/1/2022 | $166,364.00 |
| 7) | Athletico from 11/17/2017 to 4/18/2018 | $12,924.00 |
| 8) | Walgreens from 11/17/2016 to 11/8/2018 | $948.67 |
| 9) | Anesthesia Consultants of Morris on 7/10/2017 | $3,630.00 |
| 10) | ENT Surgical Consultants from 4/4/2019 to 4/5/2019 | $334.01 |
| 11) | Dr. Peter Analytis on 2/24/2017 | $383.00 |
| 12) | Dr. Hassnain Syed from 11/10/2017 to 12/19/2018 | $450.00 |

¶ 50    The defense called defendant Patrick Watson, who testified that he was, at the time of trial, 38 years old and married with two children. He lived near the accident scene and on the day of the accident was on his way to work as a physical education teacher. He stated that, after asking plaintiff if she was okay, he looked at the cars at the scene and took some photographs. A police officer cleared him to go and he left for work. He told his wife about the accident later that day and eventually forgot about it until he was served with a complaint two years later.

¶ 51     The defense next called plaintiff Laura Arteaga as an adverse witness. She testified that she had had back pain for a few months prior to seeing Dr. Ali in May 2016, that she did not know how she herniated the disk, and that she had found Dr. Ali on her own without a referral. She stated that following the June 2016 surgery she was doing great and had no pain. She did not specifically recall what exercise she was doing when she felt discomfort from physical therapy in September 2016, but remembered that it was one event, although the discomfort was not pain at first and was not immediate.

¶ 52     As to lost wages, she did not recall how long she was out of work after the first surgery but was out of work 12 weeks after the second (July 2017) surgery, which she estimated amounted to $14,000 in lost wages.

¶ 53     Defendant called his retained expert witness, legal nurse consultant Mary Rossi, who testified as to the reasonableness of medical bills for plaintiff's treatment. She does not offer testimony or opinions as to the medical necessity of any treatment, but reviews bills submitted to her for descriptions and coding to determine reasonable value of medical services provided. She was provided with plaintiff's medical bills beginning on September 28, 2016, and ending on December 27, 2018. Her opinion was that, out of the $296,055.87 in total bills she reviewed for that period, the reasonable value for the treatment rendered was $105,904.70. Out of the $190,161.17 that Ms. Rossi would have removed from the billing, $30,000 was for a typographical error in the billing for a 2018 injection, $41,000 was for a hospital charge in July 2017 that was not sufficiently documented, approximately $26,000 in an additional/duplicative bill for that same hospital stay, and a $24,961 bill from Dr. Ali she believed should have not been charged in bills relating to the fusion surgery in 2018.

¶ 54    Defendant presented the videotaped evidence depositions of their retained expert orthopedic surgeon and spine specialist, Dr. Frank Phillips, a spine specialist on faculty at Rush Medical Center. Dr. Phillips generated two reports, the first based on his review of Dr. Ali's medical records and the radiologist reports regarding the various MRIs and CT scans. His second report was based on his additional review of the actual MRIs and CT scans themselves. His testimony was bifurcated; the first evidence deposition was taken before his review of imaging, the second was taken after. His opinion was the same in both reports and both evidence depositions: that the accident caused at most a lumbar strain.

¶ 55    In the first portion of his testimony, Dr. Phillips characterized Dr. Ali's October 20, 2016, diagnosis as "lumbar sprain – strain from the motor vehicle accident and recommends a home exercise program." Dr. Phillips stated that recovery from a lumbar strain should take, "in a well-motivated patient, without complicating issues," between two and three months for 90% of patients. Dr. Phillips reviewed the radiologist's CT report from October 25, 2016, the report of the pre-accident September 22, 2016, MRI, and the November 10, 2016, MRI report. He opined that "the appearance was essentially unchanged so no changes in the MRI between September 22nd and November 10th of '16" and that the MRIs were "[e]ssentially the same, yes, no structural changes." He stated that it was his opinion to a reasonable degree of medical certainty that there was "no evidence of any structural injury or injury seen on the imaging to her lumbar spine" from the car accident. It was also his opinion that the July 10, 2017, fusion surgery was "unrelated to any injury suffered in that accident."

¶ 56    Dr. Phillips stated that after the accident plaintiff's symptoms "don't seem to be substantially changed" and the "imaging before and after the accident is essentially unchanged." His opinion, however, was that, although there was no structural damage to her spine, "based on

her subjectively saying my back hurts, it would be reasonable to give her a diagnosis or make a diagnosis as a treating surgeon who saw her contemporaneous with the accident that it was a sprain/strain-type injury at most."

¶ 57    On cross-examination, Dr. Phillips stated that he relies on documentation of patient complaints of pain in his review of cases and that, as a treating surgeon, he asks patients about their pain and relies on that history. Patient reports are relevant information to consider. He agreed that, because of her surgery, plaintiff would have been susceptible to developing back pain and leg pain from a car accident. The type of movement plaintiff described in the emergency room, that she was struck from the back, causing her to lunge backward in her seat and jarred her neck, is something that can aggravate back pain in someone with existing back pain. Dr. Phillips agreed that plaintiff reported feeling "ten out of ten" pain in her back at the emergency room. He relied upon plaintiff's complaints of increased back pain and described them as symptoms of low back strain, which is an injury to muscle for which he would not recommend surgery. He believed Dr. Ali's home exercise recommendation after the accident was "a reasonable treatment recommendation" but disputed Dr. Ali's opinion that plaintiff's disk degeneration was worsening in early 2017: "I don't believe there's any evidence of any objective imaging studies of progressive disk degeneration." Finally, he opined that the July 2017 surgery performed by Dr. Ali was based on "subjective complaints that appear to have changed over time and some mild degenerative changes in her lower back," but believed there was "no objective pathology that would necessitate it other than the chronic mild degenerative pathology at that [L4-L5] level."

¶ 58    In his second evidence deposition, after reviewing the MRIs from September 22, 2016, and November 10, 2016, Dr. Phillips repeated his opinion that there was no change in the imaging and no "structural alteration" to plaintiff's lumbar spine from the accident. He revealed that there were

still some films he had not seen, but further opined that the July 2017 surgery was not necessitated by the accident because plaintiff had residual symptoms before the accident, her symptoms did not change substantially after the accident, Dr. Ali did not consider plaintiff a candidate for further surgery following the accident, and the MRIs before and after the accident were essentially unchanged. Dr. Phillips added that there was "no evidence of any structural injury to her spine at all on those two MRI's subsequent to the injury."

¶ 59     At the close of all the evidence, the trial court granted plaintiff's motion for a directed verdict on the issue of liability and submitted the issue of damages to the jury. During their deliberations the jury asked to review the accident report, "medical billing by date," the ambulance report, Dr. Ali's records, and emergency records, which the court denied, although the medical bill stipulation was sent back to the jury. Forty-five minutes later, the jury returned a damages verdict in the amount of $35,000, consisting of $34,598 for medical bills and $402 in lost wages but no damages for pain and suffering or loss of normal life. Plaintiff filed a motion for a new trial (see 735 ILCS 5/2-1202(b) (West 2020)), which the trial court denied, after which plaintiff filed this timely appeal.

¶ 60                                    II. ANALYSIS

¶ 61     On appeal, plaintiff contends that she is entitled to a new trial on damages because the jury's verdict awarding $34,598 in past medical bills without awarding any damages for pain and suffering or loss of normal life was against the manifest weight of the evidence. In particular, plaintiff argues that the jury's verdict ignored a proven element of damages.

¶ 62     We begin with the standard of review. An appellate court reviews a trial court's ruling on a posttrial motion for a new trial for an abuse of discretion. *Maple v. Gustafson*, 151 Ill.2d 445, 455 (1992). In determining whether the trial court abused its discretion, we should consider

whether the jury's verdict was supported by the evidence. *Id.* Additionally, we must consider that the trial court had the benefit of its observations of the witnesses, their manner in testifying, and of the circumstances aiding in the determination of credibility. *Stamp v. Sylvan*, 391 Ill. App. 3d 117, 123 (2009). If the trial court finds, in the exercise of its discretion, that the verdict was against the manifest weight of the evidence, it should grant a new trial. *Snover v. McGraw*, 172 Ill. 2d 438, 456 (1996). A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the jury findings are unreasonable, arbitrary, or not based upon any evidence. *Id.* at 454. A jury's damage award is entitled to great respect, and we will not upset a jury's award of damages unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered. *Id.* at 447.

¶ 63    A jury may award pain-related medical expenses and at the same time may also determine that the evidence of pain and suffering was insufficient to support a monetary award. *Snover*, 172 Ill. 2d at 448. In certain circumstances, it lies within the jury's power and discretion to award nothing for pain and suffering even though it awarded damages for pain-related medical expenses. *Id.* A jury's computations when determining a dollar amount for damages are not precise and are subject to compromise. *Id.* An award for pain and suffering is especially difficult to quantify. *Id.* Unlike medical expenses, an award for pain and suffering is not readily calculable in terms of money, and a jury must draw on their real-life experiences in determining such an award. *Id.* at 448-49.

¶ 64    However, in some cases, an award of medical expenses without a corresponding award for pain and suffering might be inappropriate. *Id.* at 449. If the evidence clearly indicates that the plaintiff suffered serious injury, a verdict for medical expenses alone could be inconsistent. *Id.* In

assessing the merits of a posttrial motion challenging a damages verdict, the trial court should consider the distinction between subjective complaints of injury and objective symptoms. *Id.* In a case where the evidence of injury is primarily subjective and not accompanied by objective symptoms, the jury may choose to disbelieve the plaintiff's testimony as to pain. *Id.* In such a situation, a jury may reasonably find the plaintiff's evidence of pain and suffering to be unconvincing. *Id.*

¶ 65     In *Snover*, the plaintiff was a seventeen-year-old passenger in defendant's motor vehicle when it was struck by another car on the passenger side. *Id.* at 441. Plaintiff complained of abdominal pain at the scene and was taken to the emergency room, where she was examined and released. *Id.* She did not complain of any neck pain and had full range of motion. *Id.* She was on her school's tennis team and missed "three days to one week" of tennis but was able to resume regular tennis activities afterward. *Id.* She missed the same amount of time from her gym class but remained able to participate in her track team's activities. *Id.*

¶ 66     The plaintiff in *Snover* went to see her personal doctor two days after the accident for headaches, but she had suffered regular headaches prior to the accident. *Id.* A CT scan showed no sign of head injury. *Id.* at 442. Four months later, she went to a neurologist, complaining of headaches and, for the first time, dizziness and neck pain. *Id.* She was diagnosed with a cervical strain and given physical therapy, which she attended on nine occasions ending February 21, 1990. *Id.* Nine months later, plaintiff began seeing a chiropractor, who prescribed more physical therapy, then went back to the neurologist, who also prescribed more physical therapy. *Id.* The court noted that the jury heard evidence that plaintiff was also involved in two subsequent car collisions in 1991 and suffered a weightlifting injury on January 31, 1991, which the defense argued aggravated any existing neck injury. *Id.*

¶ 67    After a directed verdict on liability, the *Snover* jury awarded only those medical damages correlating to treatment ending on February 21, 1990, awarding no medical expenses incurred after that date and awarding zero damages for pain and suffering. *Id*. On appeal, the plaintiff argued that the award of medical expenses for pain-related treatment was *per se* inconsistent with awarding no damages for pain and suffering. *Id*.

¶ 68    The supreme court in *Snover* rejected the *per se* rule, holding that "a jury may award pain-related medical expenses and may also determine that the evidence of pain and suffering was insufficient to support a monetary award * * * in this circumstance where the evidence supports such an award." *Id*. at 448. The court noted that the plaintiff was able to play tennis and participate in gym class within a few days of the accident and "had few, if any, objective symptoms of injury," expressing only subjective complaints of pain. *Id*. The court also noted plaintiff's "delay in seeking some of the treatment," her ability to continue her normal daily activities, the subjective nature of her complaints, and the conflicting expert testimony as to whether her neck complaints related to the accident. *Id*. Based on this evidence, the court held that the jury could have simply concluded that the plaintiff suffered only minor injuries and awarded damages accordingly. *Id*.

¶ 69    However, the *Snover* court also emphasized that:

> "in other cases, a jury's award of medical expenses without a corresponding award for pain and suffering may be inappropriate. If the evidence clearly indicates that plaintiff suffered serious injury, a verdict for medical expenses alone could be inconsistent. This determination is best made by the trial court in a post-trial motion. * * * In making this determination, the trial court should consider the distinction between subjective complaints and objective symptoms. In cases in which a plaintiff's evidence of injury is primarily subjective in nature and not

accompanied by objective symptoms, the jury may choose to disbelieve the

plaintiff's testimony as to pain."

*Id*. at 449. A jury's award of damages can be overturned when, *inter alia*, "a proven element of

damages was ignored." *Id*. at 447.

¶ 70    The present case is distinguishable from *Snover*, as there was substantial evidence of

"objective symptoms" of injury to plaintiff. For example, the plaintiff in *Snover* complained solely

of abdominal pain at the scene and only later complained of headaches, which she had suffered

prior to her accident. In the instant case, plaintiff immediately communicated her severe lower

back pain to the defendant, a police officer, a paramedic, a nurse and a doctor at the emergency

room, and continued to show pain behaviors consistent with her injuries. Additionally, unlike a

17-year-old with full range of motion who missed only three days of competitive tennis, plaintiff

in this case was in her forties with a history of diabetes and lower back surgery who was unable to

exit her vehicle after the accident, experienced radicular pain consistent with a more extensive

injury than the one that pre-existed the accident, needed a handicapped parking placard because

she had difficulty walking 200 feet, then endured multiple injections and daily use of narcotic

medication to relieve her pain. Whereas Ms. Snover suffered "other possible neck injuries" from

two subsequent car accidents and a weightlifting injury (*id*. at 442), plaintiff, in the present case,

had no subsequent occurrences but continued to worsen, experiencing difficulty getting up and

needing assistance with daily living activities.

¶ 71    Further, unlike in *Snover*, plaintiff here presented objective evidence of her injuries in the

form of imaging studies. Dr. Ali observed that, although she did not have "obvious structural

findings or catastrophic findings" on the first post-accident MRI, such studies often miss damage

and subsequent MRIs showed accelerated degeneration within a year, which he attributed to the

accident. Dr. Neckrysh also testified that the imaging studies showed accelerated progression of the nerve root compression, which he opined was caused by the accident. In his opinion, plaintiff's complaints of pain after the car collision were consistent with, and explained by, the MRI images. While defendant's expert disputed this evidence, opining that the imaging showed "no evidence of any structural injury," he also admitted he had not seen all the films and conceded that plaintiff had at least suffered "mild degenerative changes" and a "sprain/strain-type injury" that he would expect to resolve within three months. Thus, not only was objective evidence presented, but the dispute was as to the extent of injury not as to whether any injury had occurred at all.

¶ 72    "A negligence defendant must take the plaintiff as he finds him, even if the plaintiff's 'eggshell skull' results in his suffering an injury that ordinarily would not be reasonably foreseeable." *Colonial Inn Motor Lodge, Inc., for Use & Benefit of Cincinnati Insurance Co. v. Gay*, 288 Ill. App. 3d 32, 45 (1997).

¶ 73    Since 1996, our appellate courts have applied *Snover* in only three cases where a jury awarded a plaintiff their medical expenses for treatment of pain but did not award any damages for past pain and suffering.[2]

¶ 74    In the first post-*Snover* case on this type of factual scenario, *Orava v. Plunkett Furniture Co.*, 297 Ill. App. 3d 635 (1998), this court reversed the trial court's grant of a new trial for

---

[2]This line of cases is distinct from those in which a jury awarded past pain and suffering but did not award other elements of damages, such as future pain and suffering, disability, or loss of normal life. See, *e.g.*, *Poliszczuk v. Winkler*, 387 Ill. App. 3d 474 (2008); *Stift v. Lizzadro*, 362 Ill. App. 3d 1019 (2005); *Obszanski v. Foster Wheeler Construction, Inc.*, 328 Ill. App. 3d 550 (2002); *Zuder v. Gibson*, 288 Ill. App. 3d 329 (1997); *White v. Lueth*, 283 Ill. App. 3d 714 (1996).

damages. The opinion contained very few facts, the only description of the accident being that a truck driver "backed his truck into plaintiff's vehicle." *Id.* at 636. The only references to the plaintiff's injuries were contained in a summary of the defendant's arguments on appeal: plaintiff suffered a "whiplash injury" that the defendant's experts did not dispute and the defense argued that any of plaintiff's "claimed injuries had no objective medical findings to support them and actually resulted from her myofascial pain syndrome, a chronic condition which predated the accident." *Id.* at 637. Orava filed no brief on appeal. *Id.* at 636.

¶ 75 The appellate court stated that the jury had "awarded plaintiff damages of $1468.99 for medical expenses and an equal amount for the aggravation of a preexisting condition." *Id.* at 636. The jury "specifically refused to award" anything for pain and suffering, disability, or lost earnings. *Id.* The opinion referred obliquely to testimony of "defendants' medical experts," holding that the jury was entitled to credit their testimony that some of the plaintiff's treaters found no objective signs of injury, that her symptoms "were therefore merely a continuation" of her pre-existing condition, and that "the accident did no more than cause a short-term cervical strain, which necessitated emergency treatment (in part as a precaution) and resolved itself within about two months of the accident." *Id.* at 637-38. The court reasoned that, "[i]n awarding damages under the 'pre-existing condition' heading, the jury was in effect compensating plaintiff for a specific type of pain and suffering—that which the accident increased or revived but did not create independently of plaintiff's already established pain syndrome." *Id.* at 638. The court concluded that the jury might also have concluded that "a separate award for pain and suffering was improper because plaintiff suffered only minimal new pain that she would not have experienced had she been perfectly healthy before defendants' truck hit hers." *Id.*

¶ 76    In the instant case, the jury did not award damages for aggravation of a pre-existing condition, meaning they could not have been "in effect compensating plaintiff for a specific type of pain and suffering." The jury in this case could not have concluded that plaintiff had already been "fully compensated" by an award for aggravation because no such damages were awarded. Moreover, the facts are distinguishable, particularly concerning the findings of plaintiff's treating physicians. Rather than find "no objective signs of injury," Dr. Ali specifically testified as to his findings from plaintiff's MRIs, in addition to taking into account her immediate and consistent reporting of increased pain, as well as her physical therapy reports. The medical evidence thus contained objective evidence of injury; in fact, the dispute here centered on the extent of injury, not whether any injury occurred at all. Both sides' experts agreed that plaintiff had suffered a lumbar strain from the accident, although defendant's expert, Dr. Phillips, qualified that as "a sprain/strain type injury at most." While the defendant's expert minimized the extent of changes shown on MRI studies, he did not dispute the existence of changes shown on the MRIs over time, opining instead that they were not caused by the accident. Thus, we also find *Orava* distinguishable.

¶ 77    Two more recent cases are persuasive and applicable to the instant facts.

¶ 78    In *Murray v. Philpott*, 305 Ill. App. 3d 513 (1999), the plaintiff was injured in a lake when she was struck by a water ski rope. The jury awarded damages for substantially all of her lost wages, home care, and medical bills, but nothing for pain and suffering. *Id*. at 514. The appellate court reversed the jury's verdict and ordered a new trial on damages, holding that the plaintiff had presented sufficient objective evidence of injury that the jury could not disregard. *Id*. at 515-16. The court noted that "three different doctors found objective symptoms of injury," the medical experts each agreeing that "plaintiff suffered a soft-tissue injury" and differed only as to the extent

of injury. *Id.* at 515. The court also emphasized a cervical spine x-ray showing straightening of the lordotic curve "consistent with her subjective complaints of stiffness and spasm." *Id.* The court distinguished *Snover*, pointing out that the plaintiff missed nine weeks of work due to her injury, had suffered no intervening subsequent injuries, and the jury awarded all of her claimed medical expenses and home help, along with most of her claimed lost wages. *Id.* at 515-16. The court also noted that the plaintiff had an eleven-month gap in treatment and that some of her pain could be attributed to repetitiveness of her job. *Id.* at 515. Nonetheless, it reversed the jury's verdict on damages.

¶ 79     The court in *Murray* held that "when the plaintiff submits objective evidence of pain and suffering, such evidence may not be disregarded." *Id.* at 516. The medical testimony, in which all the experts agreed that the plaintiff had suffered at least a soft-tissue injury and where an x-ray showed an objective sign that was consistent with her subjective complaints, the court held, "there is no doubt that plaintiff sustained an injury that produced pain." *Id.* Thus, the court held that the jury's verdict for medical damages and no pain and suffering damages ignored a proven element of damages and was "irreconcilably inconsistent," necessitating reversal and remand for a new trial on damages only. *Id.*

¶ 80     In *Stamp v. Sylvan*, 391 Ill. App. 3d 117 (2009), the plaintiff was injured when the automobile she was operating was stopped at a red light and was rear-ended by the defendant. The plaintiff testified that she had her neck turned at the time and the impact caused her head to be thrust forward then the side of her head hit the headrest. *Id.* at 118. She complained of extreme lower back spasms, a headache and neck stiffness, and immediately after the accident contacted her internist, who initially prescribed ibuprofen, hot showers, and rest. *Id.* A few days later, she went to see her doctor, complaining of stiffness and soreness in her neck, radiating down her arm

into her thumb and index finger. *Id*. Her head hurt and she had difficulty turning her neck. *Id*. She then underwent MRIs and saw an orthopedic surgeon, who prescribed physical therapy. *Id*. She continued with physical therapy for three months, after which her pain was less severe and her fingers were no longer numb, but she continued to experience pain in her neck, headaches, and arm and shoulder pain. *Id*. She testified that she was active and had not had neck pain prior to the accident, but that after the accident she was no longer able to engage in sports, carry groceries or pull a suitcase. *Id*. at 119.

¶ 81     Three years after the accident, the plaintiff in *Stamp* experienced intensified pain in her neck and tingling in her fingers, after which she consulted with a chiropractor and a pain specialist. *Id*. She continued with various treatments and, as of trial, continued to see the chiropractor regularly. *Id*. She also began experiencing abdominal and digestive issues, resulting in a diagnosis of Crohn's disease that her gastroenterologist believed was caused by medications plaintiff had taken for pain relating to her neck injury. *Id*. at 119-20.

¶ 82     The defendant's medical expert testified that the plaintiff's range of motion at physical therapy was limited but that a month after the accident was improved. *Id*. at 120. He also noted she did not have any weakness or other "significant abnormalities" other than reduced sensation in the left hand. *Id*. He opined that the plaintiff had suffered a soft tissue injury to her neck and back that would heal in approximately six months and an aggravation of preexisting arthritis. *Id*. at 120-22,125. He further opined that she did not suffer a herniated disk or fracture. *Id*. at 120-22. The plaintiff's descriptions of her pain and course of improvement were consistent with a soft tissue injury. *Id*. Significantly, the defendant's expert relied in part on the plaintiff's "subjective reporting to the medical providers in the immediate time period after the accident," as well as medical reports and physical therapy records. *Id*. at 125. He also reviewed MRI reports and opined

that there was no evidence of disk herniation, just a "bulge." *Id*. at 122. The jury awarded $4348.00 for past medical expenses and zero damages for pain and suffering. *Id*. The trial court granted plaintiff's motion for a new trial as to pain and suffering and loss of normal life, finding that the award of past medical expenses would stand. *Id*. The court found that objective evidence supported an award of six months of pain and suffering and loss of normal life. *Id*.

¶ 83　　The *Stamp* court affirmed the trial court, finding that objective findings were presented, including the treating physicians' observations that plaintiff had "a cervical sprain with loss of sensation" and that physical therapy reports indicated decreased range of motion and continued pain. *Id*. at 618-19. The court noted that "the uncontroverted evidence was that plaintiff suffered a soft tissue injury" and that, while experts for both sides relied on both the plaintiff's " 'subjective reporting to the medical providers in the immediate time period after the accident,' " they also relied on MRI films and reports, physical therapy records, and treating physician records. *Id*. Based on the dollar amount of awarded medical expenses, the court found that the jury "obviously found plaintiff's injuries and damages only lasted for six months." *Id*. at 620.

¶ 84　　In the instant case, it is also not disputed that plaintiff suffered some soft tissue injury. The medical experts here also relied on both subjective reports following the accident but also on MRIs, physical therapy reports, and other medical records. Further, the jury here also obviously awarded damages for a six-month period based on the amount of medical expenses. Under these circumstances, it was inappropriate for the jury to ignore the proven element of damages as to plaintiff's pain and suffering over the course of those six months.

¶ 85　　Accordingly, we reverse the trial court and remand for a new trial as to damages for pain and suffering only for a period of six months post-accident.

¶ 86　　　　　　　　　　　　III. CONCLUSION

¶ 87     For the reasons stated, we reverse the judgment of the circuit court of Kendall County and remand this cause for further proceedings.

¶ 88     Reversed and remanded.