2026 IL App (1st) 241465-U

SECOND DIVISION
January 27, 2026

No. 1-24-1465

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| LIDO HOSPITALITY, INC. | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | 21 CH 2186 |
| | ) | |
| AIX SPECIALTY INSURANCE COMPANY, | ) | Honorable |
| | ) | Neil H. Cohen, |
| Defendant-Appellee. | ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. Summary judgment for defendant insurer was proper. Plaintiff's expert did not create question of fact as to whether policy exclusion applied.

¶ 2    The question in this appeal is whether damage to a hotel wall after a windstorm is covered under a commercial insurance policy. More specifically, the issue is whether a pre-existing damage exclusion applies. The circuit court found that it did and entered summary judgment in favor of the insurer. We agree and affirm.

¶ 3                                    BACKGROUND

¶ 4    Plaintiff Lido Hospitality, Inc. (Lido) operates the Lido Motel in Franklin Park. In November 2020, one of the brick veneer walls of the motel collapsed during a windstorm. At the

time, Lido was insured under a policy issued by defendant AIX Specialty Insurance Company (AIX) that took effect eight months before the collapse, or March 2020. The policy provided coverage for damage caused by windstorms. But it also contained an exclusion: "This insurance does not apply to any loss or damage directly or indirectly caused by or resulting from any building damage existing at the time of this policy's inception."

¶ 5    Lido reported the loss to AIX. In investigating the claim, AIX determined that the brick veneer collapsed due to pervasive wear and tear and corrosion of the underlying infrastructure that secured the veneer—specifically, the components that anchored or tied the masonry veneer to the underlying wooden substrate. AIX thus denied the claim under the exclusion mentioned above, as pre-existing building damage either directly or indirectly caused the collapse.

¶ 6    Lido filed this action, seeking a declaration that the AIX policy covered his loss. AIX responded that the pre-existing damage exclusion barred coverage. The parties engaged in discovery and presented experts on the cause of the wall collapse.

¶ 7    AIX's expert, Dr. Dennis McGarry, opined that the collapse was caused by the combination of the high wind and corroded anchors, that the collapse could not have been caused by either factor alone. In his words: "If you don't have wind, then the wall is never going to collapse if the ties aren't good anymore. If you have high winds and the ties are still good, then nothing is going to happen."

¶ 8    Lido's expert, Dr. Behrooz Moradi, a civil engineer, equivocated. While he opined that the wind was the "main cause" of the collapse, he repeatedly refused to say that the corroded anchors/ties did not also contribute to the collapse. On multiple occasions, he conceded it "was possible" that the pre-existing damage contributed to the collapse.

¶ 9       The parties filed cross-motions for summary judgment. In a written order, the court found "no genuine issue of material fact that the collapse of the wall was, at a minimum, indirectly caused by or resulted from the corroded anchor ties" and ruled "that coverage for the November 10, 2020 occurrence is excluded from the Policy." The court entered summary judgment in favor of AIX and denied Lido's motion for summary judgment. Lido timely appealed.

¶ 10                                    ANALYSIS

¶ 11      Summary judgment is appropriate if the pleadings, depositions, admissions and affidavits, when viewed in the light most favorable to the non-movant, show that there is no genuine issue of any material fact, and the movant is entitled to judgment as a matter of law. *Pielet v. Pielet*, 2012 IL 112064, ¶ 29. Our review is *de novo*. *Id.* ¶ 30. *De novo* review would be appropriate, anyway, as we are interpreting an insurance contract. *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 222 Ill. 2d 303, 311 (2006).

¶ 12      Our analysis requires us first to interpret the insurance policy and then, if necessary, to determine if material questions of fact remain that preclude summary judgment.

¶ 13                              I. Policy Interpretation

¶ 14      Insurance contracts are interpreted the same as other contracts. *Bozek v. Erie Insurance Group*, 2015 IL App (2d) 150155, ¶ 19. We give effect to the intent of the parties as expressed by the words of the policy. *Livorsi*, 222 Ill. 2d at 311. If the language is unambiguous, we give it its plain and ordinary meaning. *Id.* We construe any ambiguity in favor of coverage. *Id.*

¶ 15      But the parties do not claim that the exclusion here is ambiguous. The language again: "This insurance does not apply to any loss or damage directly or indirectly caused by or resulting from any building damage existing at the time of this policy's inception." We agree that the language is unambiguous. This exclusion is known as an anti-concurrent-causation provision.

¶ 16 A concurrent cause is when "two perils converge at the same point in time, contemporaneously and operating in conjunction" to cause a loss. *Bozek*, 2015 IL App (2d) 150155, ¶ 26. A concurrent-causation provision governs the level of coverage, if any, that exists when there are multiple causes that contribute to a loss, some of which may be covered while others are excluded. *Id*. ¶ 21.

¶ 17 An *anti*-concurrent-causation clause like the one here, on the other hand, is on the "extreme" end of "narrow coverage." *Id*. ¶ 23. Under an anti-concurrent-causation provision, "there is no coverage if even one contributing cause is an excluded event." *Id*. ¶ 23. Though controversial, most jurisdictions have upheld them. See *id*. ¶ 37 (noting that "[t]he majority of jurisdictions have rejected public policy challenges" to such provisions and declining to express opinion under Illinois law). Lido does not challenge the clause here as against public policy.

¶ 18 AIX says the undisputed facts show that the corroded anchors were *a* cause of the wall's collapse and thus were at least an "indirect" cause of the loss under the exclusion, if not a direct one. See *id*. ¶ 34 (because two causes "contributed concurrently" to loss, and one cause was excluded from coverage, "the anti-concurrent-causation clause plainly precludes coverage.").

¶ 19 Lido says AIX is reading the exclusion incorrectly. Lido cites the longstanding rule of law in Illinois that a defendant takes a plaintiff as it finds her, often known as the "eggshell plaintiff" rule. See *Colonial Inn Motor Lodge, Inc v. Gay*, 288 Ill. App. 3d 32, 45 (1997) ("A negligence defendant must take the plaintiff as he finds him, even if the plaintiff's 'eggshell skull' results in his suffering an injury that ordinarily would not be reasonably foreseeable."). In other words, if the hotel had corroded anchors, AIX had to take the hotel as it found it—it had to accept that pre-existing condition and cannot exclude coverage on that basis.

¶ 20    In *Gay*, we applied the eggshell-plaintiff doctrine to a hotel. *Id*. There, the defendant backed his car into a small HVAC unit near the wall of the hotel, which caused a break in the HVAC unit's gas line. *Id*. at 37. Ultimately, the gas leaked into the hotel's laundry room and reached a pilot light on a dryer, resulting in an explosion. *Id*.

¶ 21    The hotel sued the driver. The circuit court entered summary judgment for the driver, finding the overall set of circumstances to be unforeseeable, leaving the plaintiff unable to establish either duty or proximate cause. *Id*. at 43. We reversed, recognizing that "a building rather than a person may have had an 'eggshell skull,' " and thus the negligent driver took the plaintiff hotel as he found it. *Id*. at 45.

¶ 22    Lido is correct that the "eggshell plaintiff" rule is alive and well in Illinois. See *Lough v. BNSF Railway Co.*, 2013 IL App (3d) 120305, ¶ 30; *Arteaga v. Watson*, 2024 IL App (2d) 220406-U, ¶ 72. But the problem for Lido, as the circuit court noted, is that the "eggshell plaintiff" rule is a common-law tort principle, not a canon of contract construction.

¶ 23    True, *Gay* involved an insurance company and a hotel for a plaintiff, but that's where the similarities to this case end. Make no mistake, *Gay* was a garden-variety negligence action, plus a Dramshop Act claim against the bar that served the driver alcohol. *Id*. at 35. The insurer was a party only because it had already paid out a claim to the hotel and thus stood in the hotel's shoes for the purpose of recovery. *Id*. In the end, *Gay* serves as nothing more than a reiteration of a tort principle in a tort action that, unfortunately for Lido, has no bearing on our analysis.

¶ 24    What matters here, obviously, is the plain-language interpretation of this exclusion. And the policy language here clearly does not adopt the sentiment of the eggshell-plaintiff rule; if anything, it does the polar opposite. In providing that AIX will not cover any damage "directly or indirectly caused by *** any building damage existing at the time of this policy's inception," the

insurer does anything *but* take the hotel as it finds it. This language means that if (1) some damage to the building (2) that predates the issuance of the policy (3) contributes in whole or in part to the claimed loss, coverage will be excluded.

¶ 25    All of which is to say that, as the circuit court ruled and as AIX urges, if the pre-existing corrosion in the anchors even indirectly caused the collapse of the wall, then the exclusion applies, and Lido is not entitled to coverage.

¶ 26                                II. Question of Material Fact

¶ 27    Now that we have established that the corroded anchors need only have indirectly caused the wall's collapse, and need not be the direct or main or sole cause for the exclusion to apply, we turn to whether a question of fact exists on this question to preclude summary judgment.

¶ 28    We start with the uncontested facts. There is no dispute that the brick wall that collapsed in November 2020 was built in the 1950s; that the anchors securing the wall were corroded from water damage; that this corrosion was present before the policy was issued eight months earlier in March 2020; that there is no evidence that the wall was repaired at any time since it was built.

¶ 29    As for the policy exclusion, the parties do not dispute that the corroded anchors constituted "building damage" under the policy exclusion. The parties even agree that the high winds that day were at least *a* cause of the collapse.

¶ 30    The parties at least implicitly agree on something else: expert testimony was necessary to establish causation here. That is undeniably true. An expert is necessary when the testimony requires specialized knowledge beyond the ken of the layperson. See Ill. R. Evid. 702 (eff. Jan. 1, 2011) ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion

or otherwise."); Ill. R. Evid. 701 (eff. Jan. 1, 2011) (lay witness may *not* testify to opinion "based on scientific, technical, or other specialized knowledge within the scope of Rule 702");

*Thompson v. LaSpisa*, 2023 IL App (1st) 211448, ¶¶ 33-34.

¶ 31    The testimony of the experts covered matters of metallurgy and civil engineering that went well beyond the ken of the layperson. The parties correctly rely on expert testimony on causation. So this comes down to a battle of the experts, as both parties recognize.

¶ 32    AIX's expert, Dr. McGarry, was clear that two factors worked in tandem, and that neither factor could have succeeded without the other, to cause the wall's collapse: the high winds and the corroded anchors. The corroded anchors, alone, did not cause the collapse—they needed the high winds. The high winds, alone, did not cause the collapse—they needed the corroded anchors. If that theory prevails, AIX was entitled to summary judgment, because the corroded anchors were a pre-existing condition that at least indirectly caused the collapse.

¶ 33    Once a party has established its basis for summary judgment, the non-movant must present some evidence that would arguably entitle it to success at trial. *Berke v. Manilow*, 2016 IL App (1st) 150397, ¶ 31. The question is whether the testimony of Lido's expert, Dr. Moradi, was sufficient to create a triable question. We agree with the circuit court that it was not.

¶ 34    In its briefing on appeal, Lido repeatedly claims that its expert, Dr. Moradi, opined that the windstorm was the "exclusive" cause or the "sole" cause of the collapse, that the corroded anchors "played no role in the collapse whatsoever." If that were true, we would have a disputed question. But that is not what Dr. Moradi said.

¶ 35    In his report and during his deposition, Dr. Moradi referred to the windstorm as the "main cause" of the wall's collapse. And given many opportunities during his deposition, he never

ruled out that the corroded anchors were a secondary, indirect cause of the collapse. In fact, he readily admitted that he could not rule them out as a cause:

"Q. Do you agree that the secondary cause of the collapse could be the rusted anchors?

A. They could have participated, yes."

Q. So they could have indirectly attributed [*sic*] to the wall's collapse? The rusty anchor could have indirectly contributed to the wall's collapse coupled with the storm?

A. When you say could, yes, they could.

Q. You can't rule that out, fair?

A. Yes."

¶ 36 Nor are we merely isolating one passage here, based on sharp questioning from opposing counsel. When speaking at length on the topic, Dr. Moradi freely said the same thing:

"Q. Your opinion is that the main cause of the wall's collapse was wind, correct?

A. Yes.

Q. So if there is a main cause, would that mean there is a secondary cause?

A. There could be other causes, also, that contributed to that. Let's say you are talking about rusty anchors. Let's say if the anchors are not rusty, was that possible that we could have a like—you could prevent the collapse? It is possible. We cannot say it is not possible. It was possible that we didn't have any rusty [*sic*], and we had enough anchor, and then we might not have collapse. It is possible, but based on my opinion, if you didn't have that storm, we wouldn't have any of this damage. Main cause is the storm."

¶ 37 Unfortunately for Lido, Dr. Moradi's opinion that "if you didn't have that storm, we wouldn't have any of this damage," is insufficient to defeat the policy exclusion here, which denies coverage if the corroded anchors were even an indirect cause of the collapse. Indeed,

AIX's expert, Dr. McGarry, testified to the same thing—the wall would not have collapsed without the windstorm. But Dr. McGarry also testified that the wall would not have collapsed absent the corroded anchors, and Dr. Moradi did not reject or contradict that opinion in any way. He said Dr. McGarry's conclusion was "possible," that he could not rule it out.

¶ 38    Lido argues that Dr. Moradi was doing nothing more than allowing, in an almost metaphysical sense, that "anything's possible," as one might say. But this was not an occasion for wistful conversations. Lido is correct that experts have to speak in terms of a reasonable degree of certainty, not absolute certainty, but Dr. Moradi never testified, to a reasonable degree of scientific certainty, that the corroded anchors were *not* one of the causes of the wall's collapse. Lest we be accused of relying on formal buzzwords, Dr. Moradi never opined in *any* way that the corroded anchors were not a cause. He didn't say it was unlikely that the corroded anchors were a cause or that he doubted they were a cause. Nor did his report reflect any such sentiment.

¶ 39    To the contrary, Dr. Moradi was clear that it was entirely possible that the corroded anchors were at least indirectly to blame; his larger point, to which he continually returned, was that the high winds were the *principal* cause. Unfortunately for Lido, that opinion is not enough to avoid application of the policy exclusion here.

¶ 40    Lido warns that our interpretation of this exclusion will lead to insureds losing coverage for latent conditions of which they are obviously unaware. We agree that the coverage here was quite narrow. But again, Lido does not claim that this exclusion is void as against public policy, nor did it do so in the circuit court, and we will not (we cannot) play advocate and take up that mantle for Lido. *1010 Lake Shore Association v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14 ("Issues not raised in either the trial court or the appellate court are forfeited"); *Tuna v. Wisner*, 2023 IL App (1st) 211327, ¶ 56 (searching for unargued errors on appellant's

behalf " 'transform[s] the court's role from that of jurist to advocate' and forces the court 'to speculate about the arguments the parties might have presented had the issues been raised.' ") (quoting *People v. Givens*, 237 Ill. 2d 311, 328 (2010)).

¶ 41    Beyond that, Illinois generally adheres to the concept of freedom of contract and the notion, stated bluntly, that you get what you pay for. See *Braye v. Archer-Daniels-Midland Co.*, 175 Ill. 2d 201, 215 (1997) (public policy of Illinois favors freedom of contract); *National Fire Insurance Co. of Hartford & Continental Insurance Co. v. Visual Pak Co., Inc.*, 2023 IL App (1st) 221160, ¶ 109 ("sometimes the insured knowingly obtains limited coverage, and the premiums are set accordingly.") Less coverage generally means lower premiums; the more expansive the coverage, the more expensive the premium.

¶ 42    We do not know why Lido chose this policy, though one might venture that it was a less expensive policy in light of the anti-concurrent-causation exclusion before us. In any event, the exclusion language clearly applies, and it is our duty to interpret it as written.

¶ 43    As the exclusion applies here, and we find no question of material fact precluding summary judgment, we affirm the circuit court's judgment.

¶ 44                                              CONCLUSION

¶ 45    The judgment of the circuit court is affirmed.

¶ 46    Affirmed.